If you would, we'll take the next case now, which is Chapman v. Santini, No. 18-1117. Counsel, when you're ready. May it please the Court, my name is David Moskowitz and I represent the defendant appellants in this action. The District Court committed three primary legal errors in denying qualified immunity. First, the Court failed to follow Supreme Court precedent that each defendant in a Bivens case must be analyzed based on his own actions, his own knowledge, and his own intent. Instead, the Court grouped all of the defendants improperly together as one, and that infected all of the Court's analysis. Second, the Court failed to properly apply either prong of the Eighth Amendment standard. The Court failed to analyze whether each defendant committed an objectively serious deprivation of life's necessities, here medical care. And the Court failed to analyze whether, during any alleged deprivation, each defendant subjectively acted with criminal recklessness, as required by the deliberate indifference standard. Third, the Court failed to follow the Supreme Court's rec- Criminal recklessness. What's the legal basis for that statement? It's announced in Farmer v. Brennan, and this Court has repeated it in a number of cases. They've used the word recklessness, but I don't recall criminal being attached as an adjective to that. Yes, it's actually in there, and so the idea is ordinary recklessness doesn't require a conscious awareness, criminal recklessness does. And so that's why they say criminal recklessness is the standard, and that's in Farmer v. Brennan. Third, the Court failed to follow the Supreme Court's repeated admonition that clearly established law must be highly particularized to the specific facts and circumstances of the case. And instead, the Court applied a single case, Hunt v. Uphoff, which involved the total denial of diabetes care. And in contrast to Hunt, the undisputed record here shows that every single day, Mr. Chapman received twice daily insulin injections, blood sugar testing generally four to six times per day, diabetic snacks, glucose gel. The list goes on and on and is documented in over 800 pages of medical records for the two years at issue alone. It was recommended that he would get by another doctor that he would get more diabetic insulin injections than he got, right? I don't believe so at the time. The expert after the fact has suggested... No, I thought that there was a doctor prior to Dr. Santini who had indicated that he should get at least three injections a day. I don't believe that that's documented in the record anywhere. He had different insulin regimes at different times, but I don't believe that that is an issue. But in any event, each doctor is allowed to establish what regime that they believe is appropriate for a particular diabetic patient. And if Dr. Santini viewed two insulin injections proper, that's an issue of medical judgment. Well, it's an issue of medical judgment until you reach a point where the condition that the individual is suffering is so severe, that it's clear that two injections aren't going to cut it. Dr. Santini wasn't actually even present at the beginning of the time. He didn't change the insulin in any way, but... Was he able to read the records prior to the meetings by Mr. Chapman when he would meet with Dr. Santini, which I guess he met with him twice, which is contrary to Bureau of Prisons protocol to begin with, or the prison protocol. So I don't... I think that those are actually factually inaccurate. The prison protocol is chronic care requires meeting at least once per year. And Dr. Santini met with... I thought it was quarterly. That's not right.  That's actually the prison. Dr. Santini testified that the BOP policy says you have to meet once per year. Dr. Santini actually met with him twice per year. He met with him roughly six months after Dr. Santini started in August of 2014. Then he met with him again six months later in February of 2015. And he was scheduled to meet with him again in August of 2015, but Mr. Chapman was transferred before that time. And so that's not... Dr. Santini was going beyond what the BOP requires, and Dr. Santini viewed... It's undisputed Dr. Santini viewed that the diabetic... He thought that Mr. Chapman was well controlled, and he focused on A1C, and that he believed was the best target, the best evidence of whether he's controlled. And we would show that... Didn't the records that Dr. Santini had available to him in those two meetings indicate that Mr. Chapman had serious instances of hypoglycemia and hyperglycemia repeatedly? So I don't believe he ever... So what is a serious incident of hyperglycemia? I'm not sure. Well, beyond the range of normality to a number one. Sure, but that's... And indicating that he suffered, well, what would be in some instances viewed as life-threatening conditions. I don't believe that he had anything to indicate that. So with hyperglycemia, the issue would be diabetic ketoacidosis. And that requires levels of blood glucose that are well, well beyond anything that he ever experienced at the ADX. And so he never had any issues of that, never issues with ketones. And so, yes, did his blood sugar go outside the goal range? Absolutely. But that's true for virtually every type one diabetic. What's his blood burning business that he essentially testified to, that he felt like his blood was burning, that kind of thing? I mean, he testified that he, when his... Which would be sort of a manifestation, would it not? No, so that's not a... I don't think you let me finish my sentence, did you? Wouldn't that be a manifestation of the hyperglycemia that he alleges occurred and that the record would show happened? Now you can say no if that's what you want to do. He says that when he had hyperglycemia above 250 that he would feel pain. That he definitely testified to. But that's not an ordinary symptom of hyperglycemia. And the record shows that, in fact, he had almost identical fluctuations prior to incarceration. He has an incredibly difficult to control disease and the BOP was doing their best to keep him at a good control level. And A1C remains the primary target that doctors use around the world as the gold standard for what to do. And he met his target every single time. How do you think that he might have been in severe pain? With respect to Dr. Santini, there is nothing. With respect to Mr. Osagie, there is nothing. With respect to Mr. Camacho, the record shows that on one occasion he complained to COs that he was in pain. There's no record that the COs contacted Mr. Camacho or anything. Mr. Camacho then showed up that day at his cell, provided him insulin. And at that time, Mr. Chapman told Camacho that he was in pain. But Mr. Camacho had already by that time given him the only thing that would reduce that pain, which is insulin. And wasn't there a two-hour delay in him getting to him at that time? So the prescription, and I had asked the court to look closely at this record. And note that we're going to look at the record in the light most favorable to Mr. Chapman. So if what you're giving us here are facts that dispute that, then you're in a difficult situation, aren't you? This will take us back to the jurisdictional conversation that we were having before in the pleadings. I absolutely understand and agree that we need to be in the light most favorable to the plaintiff. The prescription that he had in this, you can see throughout the medical records, is to receive insulin twice per day. Once in the a.m. and once in the p.m. Now at the ADX, there's general time frames that the pill line occurs. Pill line is unique at the ADX compared to every other federal prison, because the inmates are not free to roam around. And so in most prisons, the pill line is literally the inmate walks and stands in a line, gets their pills. At the ADX, the inmates receive their pill line at their cell site. Now neither Mr. Camacho nor Mr. Osagie, this was not their role. So they were standing in for other people because it was the nurses and other technicians whose job was to do pill line. When somebody was missing, when something was happening that was out of the ordinary, Mr. Osagie would step in. So if the person... They were aware he had type 1 diabetes, I don't think that they would... All right, were they aware of what the consequences would be of him not getting his insulin on time? So the record shows that what they're aware of is that he should have insulin available to him so that he can eat within 45 minutes of the insulin injection. And so the record also shows that every single time that they gave insulin, he had his meal. So what happened was he gets his meal, it's delivered in a tray, he's allowed to keep it in his cell. And he's allowed to then eat that meal when the insulin comes. And so the record shows that from a medical perspective, insulin works better when it's roughly within 45 minutes of the meal. And so talking about timing, Mr. Chapman certainly would prefer to have everything done at the same time every day, but the medical evidence is not that you have to eat every day the exact same time in order to control diabetes. Okay, what I'm hearing is a somewhat departure from what my understanding of the record is. So let me just try to crystallize some facts here and make sure I understand what's going on. Is it in fact the case that as relates to Mr. Osagie and the other fellow, the other medical specialists, who was the guy? So there's Osagie and Camacho who are PAs. As it relates to those two individuals, is it in fact the case that there were instances where there were two-hour delays when he would need to get his insulin consistent with what would be the protocol for him to get his insulin and he didn't get it? So I don't think there's any evidence as to what's the consistent protocol. Was there any evidence in the record that there were what would be considered two-hour delays from when he asked for it and when he got it? So when he asked for it, yes, but there's no evidence that those individuals deliberately did anything, right? If he says, I'm in pain and I need my insulin and they don't give it to him, or if he says, I need my insulin and they don't give it to him, and the consequences of not having your insulin consistent with what would be the protocol, I don't think there's any evidence. If he says, I need my insulin or potential hyperglycemic events, then why isn't that clear what's going on? So let me get to the time that he complained to the CO that he was asking for insulin. And I think it's important that the court look at that record very closely because it occurs on June 6, 2013, and it's at A2321. And you'll see that there is a record that he complained to the correctional officer that he wanted this. But there is no record of anyone telling Camacho that there was any problem. Nobody's testified to that. There's no evidence Camacho heard anything about this. Camacho came, he's delivering insulin and medications to 200-plus prisoners there when he's stepping in for somebody else. And so were there times that the time of insulin delivery varied? Absolutely. That's uncontested. But the issue is that being delayed doesn't in and of itself cause any risk. Sometimes when it's delayed, they... You're saying that as a clinical matter, being delayed does not increase your risk of having events. So the way that insulin works, there's a long-acting insulin that's given... Just answer the question, please. Is there a potential that you will have either hypoglycemic or hyperglycemic events when there is a delay in you getting your insulin? I don't think that there is evidence on that. I asked you a simple question. Is there in fact that consequence of a delay? No. Okay. You will not suffer a hypoglycemic or hyperglycemic event because there is a delay of you getting your insulin. No. So the way insulin works, insulin is delivered and there's long-acting insulin, there's short-acting insulin. And so you would get the delivery of your long-acting insulin and that can last 24 hours. The short-acting insulin then is used to be timed with the meal. And so it changes when you eat the meal, but there's nothing that says a diabetic has to get their insulin at the exact same time every day. And then in the community, many diabetics control their disease by varying the time of insulin all the time. And so this is... The prescription was for it to be in the a.m. and the p.m. and that was followed. And if there's no further questions at this time, I'd like to reserve my time. I have a question. What's the record going to show us as to the general protocol at the prison for when he was getting his insulin? Did he generally get it at the same time every day, but there were some fluctuations? So it generally fluctuated, I think, is the best answer. And this is unsurprising in a highly secure prison is that the pill line, and especially when somebody else is filling in and doing it on top of their ordinary duties... Right, but that's the... So when someone's filling in, that's the exception of how it happens. So I mean, this is a general matter. I think it depended on who was doing it that day. They had different times that they would come and do it, but I don't think that there was anyone who did it exactly the same time every single day. Okay, and the record's going to support that? So you can look and you can see the times in the insulin administration and the medical records will show you when everybody gave their insulin. It absolutely fluctuated, and it fluctuated when it was done by all sorts of different people, and that's what the record will show. Thanks. Thank you, counsel. May it please the court, Mr. Motzowitz. My name is Olivia Kors, and I represent Mr. Saifullah Chapman, the appellee in this case. I'm here today with Laura Rogner and Danielle Jeffries. Diabetes, as you've heard, is a minute-by-minute disease. It requires careful coordination of the three interdependent pillars of diabetes care, food, diet... And without that careful coordination, insulin is, at one moment, a medicine, and at the next moment, it's a poison. Defendants knew this, and they disregarded it despite frequent interactions with Mr. Chapman. This court has held that even if a patient sees a doctor multiple times, that doesn't necessarily mean that he's receiving constitutionally adequate medical care, and that's the case here. So there are a couple topics that I'd like to touch on just in response to what you heard from defendants. First of all, there are documented instances of delays, but before that, each of the defendants knew that Mr. Chapman had type 1 diabetes. Mr. Chapman has a unique form of type 1 diabetes that's particularly severe. He's got frequent and significant fluctuations in blood sugar, which can be seen in his own records, as well as the BOP records of his medical care, the blood sugar testings. So each of these three defendants knew this. Each of them knew the risks of hypoglycemia, that it could result in unconsciousness, which can result in harm if someone falls. It can result in coma and death. What was recommended if there was any recommended course of treatment in terms of number of times that he should receive insulin? I understand that under Dr. Santini's prescription, it was two times. Was that, in your view, adequate, and was there some view that that might not have been? That, in our view, was inadequate. Dr. Pelton is one of the BOP doctors that eventually recommended three times a day for Mr. Chapman. Did you say eventually recommended that? Yes, I'm not entirely sure on the timing of that at this moment, but Mr. Chapman's expert, Dr. Philipson, also opined that three times a day with insulin would be sufficient. He also said that certain policies and procedures recommend insulin with food. Was there anything in the record prior to the time that Dr. Santini took over treatment of Mr. Chapman that would have signaled that the course of treatment of two insulin injections a day might not be adequate? Yes, Your Honor. Not necessarily in the form of a suggestion from another doctor, but Dr. Santini had access to all of Mr. Chapman's medical records, and he could see the extreme swings in blood sugars that happened throughout the day. A tighter regimen of insulin would help minimize those swings. Mr. Chapman vocalized his concern about these fluctuations at each of his appointments with Dr. Santini, and Dr. Santini himself signed off on an incident of hypoglycemic unawareness, or hypoglycemia, excuse me, where another individual responded to Mr. Chapman when Mr. Chapman's blood sugar was, I believe, 35. Was the BOP protocol that Dr. Santini was supposed to meet with Mr. Chapman only one time a year? Is that correct? Yes, Your Honor. Unless the patient requires further treatment, they have the discretion to see the individual more than once, and Mr. Chapman's frequent hypo- and hyperglycemic episodes put him in that category of severe. His diabetes was not under control. Well, I mean, who makes the classification of whether it's severe? I mean, if the general BOP protocol is you meet with the doctor once a year and Dr. Santini met with him twice, then that would seem that he got more than the BOP protocol would suggest was appropriate. Yes, Your Honor. However, that takes us back to the holding in Hunt v. Uphoff, which says that even a patient who sees numerous doctors may not be receiving treatment. So Hunt says that even though the plaintiff in that case saw doctors over and over, it didn't equate to care. So here, Mr. Chapman testifies that he went to his visits with Dr. Santini. Dr. Santini kind of nodded, said, your A1C is fine, that's all I'm going to look at, refused to look at Mr. Chapman's records that showed the fluctuations. Didn't Dr. Santini, though, indicate in testimony that he not only had the records of his prior condition available to him, but he reviewed them? So, I mean, to the extent that there were these fluctuations in his condition, Dr. Santini would have been aware of that, right? Yes, Your Honor. And the fluctuations, it's important to know any instance that Mr. Chapman goes high or low results in the risk of hyper or hypoglycemia, be it the pain, the boiling blood or the crushing weight on his chest for hyperglycemia, which is high blood sugar, or the risk of unconsciousness and ultimately hypoglycemic unawareness, which is when someone experiences low blood sugar so many times they no longer feel the symptoms, so they're not able to self-treat themselves. So what's the evidence that any of the three providers we're talking about knew about him having painful incidents? So the primary kind of defendant that had this knowledge is Camacho, defendant Camacho. So those are the instances where Mr. Chapman called for insulin, said he was in pain. Mr. Camacho showed up three hours later. It's disputed how they interacted at that time. Mr. Chapman says that he asked why it took Mr. Camacho so long to get there. Mr. Camacho said he was busy and that he didn't care that Mr. Chapman was in pain because high blood sugar wasn't going to make him die. So that's one of the examples that kind of ties us back to the disputes at the heart of this case that gets the jurisdictional question that you raised earlier. Well, he's the only one, so you're saying Osagie would have had no reason to know about his pain issues? Osagie doesn't have, there's nothing in the record that says Osagie necessarily knows about that specific symptom of hyperglycemia, but Mr. Osagie has testified in his deposition that he knows that hyperglycemia can lead to coma, death, diabetic ketoacidosis. So each of them in their own way recognizes that each of these high or low instances are life-threatening. Theoretically, or would there have been anything that would have let them know that that really manifested itself as it relates to Mr. Chapman? They would know that it manifested itself in relationship to Mr. Chapman. With Mr. Camacho, it was more hyperglycemic episodes. So on appendix 2322, excuse me, or 2331, those are two hyperglycemic episodes where Mr. Camacho saw that Mr. Chapman was experiencing high blood sugar. Mr. Osagie, on the other hand, he was around more for the hypoglycemic episodes, so the low blood sugar. So one time, as defendants stated, this instance is outside of the statute of limitation, but it goes to the knowledge of Osagie. So he took 20 to 30 minutes to respond to Mr. Chapman when Mr. Chapman's blood sugar was so low it wouldn't read on the glucometer. So that means it has to be at least 20 or lower. And the record is replete with these examples. Let's talk about him responding right there. What does the record show? I mean, what did he know before he got there? I mean, did he know that he was below 20 at the time? Did someone come to him and say, oh, you got to get over here? He's below 20. Or did he find that out once he responded? The record doesn't indicate. However, Mr. Chapman was in and out of consciousness at that time. So regardless of whether or not he knew the specific number... I mean, well, he didn't know that, though, until he got there, until he responded. Perhaps, Your Honor. But as Mr. Chapman is a type 1 diabetic with known huge fluctuations in blood sugar, Mr. Osagie was on at least relative notice that if he's being called in Mr. Chapman's cell, it likely has to do with one of these life-threatening instances. Okay, fair enough. So let me ask you a question about whether the law was clearly established. What is your best case with particularized facts that you think shows us that the law was clearly established in this area? Your Honor, that would be Hunt v. Uphoff. Hunt v. Uphoff clearly established the law that prison staff's pattern of denying necessary evidence to the court and denying necessary medical care amounts to deliberate indifference and therefore violates the Eighth Amendment. So in this situation, the court looked at a variety of factors. There are five things that it pointed to, the denial of insulin, the failure to diagnose or treat particular medical conditions, the failure to provide a prescribed diet, the confiscation of medication, and the failure to treat blood sugar numbers. So the court took these as a whole and said that together these things amounted to deliberate indifference. And that's kind of how this case is most particularized to the case of Mr. Chapman because diabetes is inherently, it requires this coordinated care. It requires these three pillars to be working together. And the court in Hunt recognizes that with medicine and the prescribed diet.  Defendants were engaging in this pattern of inadequate care, be it arriving late with the wrong insulin, air bubbles in a syringe, not responding to incidents, not providing refills for Lancet. So Mr. Chapman just had to take chances on what his blood sugar was at any given moment. So that's what makes the law clearly established in these three defendants on notice that their conduct violated the Eighth Amendment. Is there a distinction with a difference that according to appellant that there's a denial in Hunt and there isn't a denial of insulin here? There is a denial of insulin. Perhaps not for an entire year. However, diabetes is a unique disease. What didn't kill Hunt being denied insulin in a year would have killed Mr. Chapman in a year. So the denial of insulin for Mr. Chapman, be it for two hours or six hours, caused extreme fluctuations in his blood sugar that didn't just extend to that day. They would continue to kind of roll out and throw everything out of whack. That's what the coordinated care, that's why that's so critical. So are you viewing the denial in terms of the delay in him getting his insulin as in effect a denial? Or are you saying that he didn't get as many insulin injections as he should have gotten? What is the position here? The denial of care is the failure to coordinate everything. So it's kind of a broader picture of care. So the denial of care here is that they didn't provide insulin to Mr. Chapman when he needed it in the doses that he needed it, even within their prescribed amount, even within the twice a day, they didn't do it correctly. So even within that framework, they arrived late, or they arrived with only one type of insulin and not another type of insulin, or there were air bubbles and Defendant Osagie testifies that he adjusted them by adding just a little bit of insulin to the syringe. You're aware that if we end up in a posture of, well, they had a pattern and protocol of care, and he should have had a different one than the one they gave him, you lose. I mean, if all this is about whether their pattern of treating him was not the one that you think is preferable or the one that you think is optimal, Eighth Amendment is a pretty high hurdle to overcome and you're going to lose. And so tell me, what about this pattern of treatment raised a constitutional issue? Yes, Your Honor, it's taken cumulatively. So in order to satisfy the deliberate indifference test, each of the defendants had knowledge that Mr. Chapman had type 1 diabetes, that he experienced these fluctuations, and they knew that in an instance, one of them could cause a coma or death, etc. Take Camacho, how did he know that there were fluctuations that Mr. Chapman suffered? He would measure Mr. Chapman's blood sugar in 2013, I believe. The numbers were high or low, 60% of the time those numbers are in the record. So every time he measured Mr. Chapman's blood sugar, he would see... So how often did he do that? I thought that Chapman, with his lances, was responsible for doing that himself, no? So BOP was responsible for measuring twice a day if they brought their own materials, and then Mr. Chapman was kind of at the mercy of the BOP. If he received the appropriate refills, then he could test his own blood sugar. It's the cumulative effect and the denial of care as a whole through this pattern of inadequate care. It's not what Mr. Chapman chose, it's that it was insufficient to care for his diabetes and to protect him from the risks inherent with these highs and lows. Well, what's going to have to happen, however, is there's going to have to be a disaggregation of that cumulative effect as it relates to each individual defendant. And so it's not going to be, oh, with this pattern, he was constitutionally denied care. You're going to have to say that each one, Camacho, Asagi, and Santini, each in their own way was deliberately indifferent. So you're going to have to cut that piece of pie, right, to do that. Yes, Your Honor, and Mr. Chapman, each of the defendants satisfy that pattern. Let's just take Asagi, then. So to kind of tie this back to jurisdiction and to how the district court did, in fact, divide out these plaintiffs a little bit just quickly, the district court in its motion to dismiss order, which it incorporated into its prior order, said that Asagi, they could find that he arrived late or had the wrong form or dosage of insulin, improperly administered insulin. Is that a proper thing for the district court to do in that context, to incorporate for facts its prior orders? I mean, it leaves us to look at those prior orders and decide what facts are relevant to the summary judgment determination and which ones aren't, doesn't it? To an extent, Your Honor, those are the inferences, or we can infer that those are the facts that the district court relied on when it arrived at its order. I mean, if the court wholesale incorporated its prior orders, it didn't say, oh, X fact from X order is relevant to my summary judgment determination now, did it? It did not. I see that my time is up, Your Honor. If I could just quickly wrap up, unless you have any further questions. Wrap up quickly. We would ask that this court dismiss this appeal for lack of jurisdiction or in the alternative, excuse me, to affirm the district court's holding that a reasonable jury could find a constitutional violation occurred and that the law was clearly established. Thank you. I think time is up on both ends. Your case is submitted. Appreciate your arguments.